UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, by C. JAMES LOWTHERS and STEPHEN A. WOODS, its Trustees,<br><br>Plaintiff,<br><br>v.<br><br>EXPRESS SCRIPTS, INC.,<br><br>Defendant. | Civil Action No.:_____ |

## COMPLAINT

The plaintiff herein, United Food and Commercial Workers Unions and Participating Employers Health and Welfare Fund ("Plan") through its Trustees, C. James Lowthers and Stephen A. Woods, hereby alleges the following upon information and belief:

### The Parties

1. The Plan is an "employee benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001, *et seq.* Its principal place of business is located at 4301 Garden City Drive, Landover, MD 20785. The Plaintiffs, C. James Lowthers and Stephen A. Woods are, respectively, Chairman and Secretary of the Board of Trustees of the Plan. They bring the present action in their capacity as Plan fiduciaries pursuant to ERISA Sections 502(a)(2) and/or (a)(3), 29 U.S.C. §§1132(a)(2)and/or (a)(3). The Plan and the Trustees who bring this action on its behalf are referred to collectively as "Plaintiff" hereafter.

2. Defendant Express Scripts, Inc. is a Delaware corporation with its principal place of business at 13900 Riverpoint Drive, Maryland Heights, Missouri 63043. From approximately 1994 through 2005, the Plan retained defendant Express Scripts Inc. and/or one or more of its parents, subsidiaries, sister companies, affiliates, and/or predecessors-in-interest, (including, but not limited to Value Rx, Inc., National Prescription Administrators (NPA), Diversified Pharmaceutical Services, Inc. (DPS), and/or Associated Prescription Services, Inc.), (collectively referred to herein as "ESI"), to provide Plan management and administrative services as the Plan's pharmacy benefit manager, or "PBM".

## Jurisdiction and Venue

3. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under the laws of the United States, specifically 29 U.S.C. §§1132(a) and 1132(e)(1).

4. The Court has personal jurisdiction over ESI because it is registered to do business, and, in fact, does systematically and continuously conduct business within this judicial district.

5. Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2). Upon information and belief, ESI's principal place of business is located within this judicial district, in Maryland Heights, Missouri.

6. This action is a "tag along" action to Multi-District Litigation (MDL) No. 1672, which is governed by the case management orders entered in Master Case No. 4:05-MD-01672-SNL.

7. Upon filing of this complaint, Plaintiff will cause it to be served upon the Secretaries of Labor and Treasury, as required by 29 U.S.C. §1132(h).

### ESI Functions as an ERISA Fiduciary

8. The funds ESI used to pay prescription drug claims on behalf of the Plan were withdrawn from the corpus of the Plan, a Taft-Hartley trust, and, as such, are "plan assets" within the meaning of ERISA. In addition, rebates due and owing to the Plan, and the interest earned on those rebates, are "plan assets" within the meaning of ERISA.

9. ESI was a "fiduciary" under ERISA, PL 93-406 § 3(21)(A), 29 U.S.C. §1002(21)(A), in its relationship to the Plan because it retained and exercised authority and control over the disposition of plan assets when determining the brand/generic status of any given prescription, when paying prescription drug claims with plan assets, and when negotiating rebates, discounts, and other pricing mechanisms with drug manufacturers and other entities dealing with the Plan. Such control over the disposition of plan assets included, but was not limited to, the following matters:

   a. ESI, in its sole discretion, established and implemented the "Maximum Allowable Cost" ("MAC") and/or "Maximum Reimbursement Rate" ("MRA") for generic drugs dispensed at retail (and/or mail) pharmacies and paid for with plan assets; ESI determined which drugs would be included on the "MAC"/"MRA" List, and therefore priced at "MAC"/"MRA"; ESI determines the "MAC"/"MRA" price the Plan will pay for the drug; and, finally, ESI determines the "MAC" price that's actually paid to the pharmacy; these decisions made by ESI, in ESI's discretion, directly affect the amount of plan assets which must be expended for the prescription drug benefits the Plan provides for its participants and beneficiaries;

   b. ESI, in its sole discretion, selected the reporting source for the Average Wholesale Price ("AWP") it used to calculate the ingredient cost for brand name drugs dispensed at retail and mail pharmacies (and/or for generic drugs dispensed by mail or at mail pharmacies) and paid for with plan assets; this selection made by ESI, in ESI's discretion, directly affects the amount of plan assets which must be expended for the prescription drug benefits the Plan provides for its participants and beneficiaries;

3

c.  ESI, in its sole discretion, contracted with drug manufacturers for the payment of "rebates" and/or "formulary savings" and/or "market share incentive payments" which are collected by ESI on purchases made with Plan assets for the purpose of providing benefits to Plan participants and/or beneficiaries; ESI determines the level of compensation paid by drug manufacturers and how that compensation will be characterized; ESI, in its discretion, therefore determines the compensation flowing to and retained by ESI through the use of Plan assets; ESI also, in its discretion, directly affects the "rebates"/"formulary savings"/"market share incentive payments" flowing back to the Plan, to the extent that such "rebates"/"formulary savings"/"market share incentive payments" are shared with the Plan on a percentage basis;

d.  ESI, in its sole discretion, established and implemented "drug switching" or "therapy adherence" programs, (such as, for example, Drug Choice Management, ExpressPreference, Preferred Product List, and OptiMed), which can generate savings to the Plan; ESI, in its discretion, determine which drugs will be included in these programs; ESI, in its discretion, also determines whether and to what extent ESI will be compensated by drug manufacturers; ESI, in its discretion, determines when and how the program will be implemented; these decisions by ESI determine the compensation flowing to and retained by ESI through the use of Plan assets; these decisions by ESI also directly affect Plan assets in terms of higher or lower costs and/or savings to the Plan;

e.  ESI, in its sole discretion, decided whether a particular prescription would be identified and priced as a "generic" prescription or "brand" prescription; this decision directly affects Plan assets in terms of the prices that are paid for Mail Order prescriptions; this decision can also affect Plan assets with respect to "MAC"/"MRA" pricing (discussed in sub-paragraph (a)), and/or "rebates" due and owing to the Plan (discussed in sub-paragraph (c)); and,

f.  ESI, in its discretion, generates interest on "rebates"/"formulary savings"/"market share incentive payments" and/or other Plan assets, by setting payment schedules from drug manufacturers and/or by deciding whether to account for interest when paying shared "rebates"/"formulary savings"/"market share incentive payments" back to the Plan.

10.  In addition, and/or alternatively, ESI was an ERISA fiduciary in its relationship to the Plan because ESI exercised discretionary authority and control over the administration and management of the Plan. Such discretionary authority and control included, but was not limited to, the following matters:

a. Implementation of information-gathering systems;

b. Implementation of claims-processing systems;

c. Claims administration;

d. Establishment, management, and administrative control over the formulary or formularies used by the Plan, including, but not limited to, the development and modification of formularies, including the determination of which manufacturers' drugs should be included in (or excluded from) ESI's standardized formulary or other formularies, and thereafter deciding (1) which drugs to add or delete from the formulary(ies), (2) which drugs will be "preferred," (3) which relative cost indicators will be placed next to each included drug, and (4) whether the contracts will include terms that enable manufacturers to circumvent the federal government's "best pricing" statute;

e. Establishing, managing or otherwise exercising administrative control over negotiations and contractual arrangements with a network or multiple retail pharmacies networks to provide prescription drugs to the Plan participants and beneficiaries;

f. Negotiating with drug manufacturers to provide rebates to the Plan;

g. Deciding which drugs would be placed on a MRA or MAC list, setting MRA or MAC pricing, determining whether a drug was "brand" or "generic," selecting from multiple different MRA or MAC lists and/or otherwise determining MAC or MRA pricing for the Plan and its participants and beneficiaries;

h. Deciding which AWP reporting source to use for brand (and/or generic) drug pricing;

i. Defining the scope and parameters of prescription drug benefits to which Plan participants and beneficiaries were entitled;

j. Deciding which brands or types of prescription drugs would be made available to Plan participants and beneficiaries;

k. Deciding the terms on which prescription drugs would be made available to the Plan and its participants and beneficiaries;

l. Deciding what co-payments, coinsurance amounts, deductibles or other amounts were payable by a Plan participant or beneficiary at the point of service;

m. Creating retail pricing spreads by determining the terms of the contracts with the retail pharmacies;

5

n. Establishing mail-order pricing through re-packaging and/or setting new NDC numbers for AWP reporting purposes;

o. Generating and retaining interest on the "float" prior to disbursement of rebates to the Plan;

p. Deciding, through contractual negotiations with third parties or otherwise, how various payments, credits, or other compensation would be characterized, in order to determine whether and/or to what extent such payments, credits, or other compensation were retained by ESI, as opposed to the Plan; and/or

q. Deciding which manufacturers' drugs to target and switch to in ESI's drug switching programs, and deciding how many switches to try to secure in connection with each drug switching pair.

11. As an ERISA fiduciary, ESI was obligated to discharge its duties with respect to the Plan solely in the interest of the Plan and its participants and beneficiaries, for the exclusive purpose of providing benefits to participants and beneficiaries, and defraying reasonable expenses of administering the Plan. 29 U.S.C. §1104(a)(1)(A). ESI also was obligated to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. §1104(a)(1)(B). Furthermore, ESI was prohibited from engaging in certain "prohibited transactions" enumerated under ERISA, 29 U.S.C. §1106. Once ESI assumed the role of an ERISA fiduciary, and then negotiated for the purchase of goods or services on behalf of the Plan, ERISA established the legal duty and presumption that ESI was acting as an agent and fiduciary for the Plan, and that any and all negotiated advantages will inure to the benefit of the Plan and its participants and beneficiaries. *See generally,* 29 U.S.C. §§1103(c)(l), 1104(a)(l)(A)(i), 1106(a)(1)(D), 1106(b)(1), 1106(b)(3) and 1110(a). ESI is liable to the Plan to disgorge all profits and/or for any and all Plan losses resulting from the breaches of such fiduciary duties, as outlined herein. 29 U.S.C.

6

§1109(a). ESI can further be enjoined from engaging in such practices, and is liable for other appropriate equitable relief. *See* 29 U.S.C. §§1109(a) and 1132(a)(3).

12. In addition, and in the alternative, ESI is a "party-in-interest" under ERISA, within the meaning of 29 U.S.C. §§1002(14)(A), (B), (G) and/or (H). Even assuming, *arguendo*, that ESI were not a "fiduciary" (which is denied), ESI is nevertheless responsible for making equitable restitution or for other appropriate equitable relief. *See* 29 U.S.C. §§ 1106(a)(1)(4) and 1132(a)(3).

### ESI Violated Its Fiduciary Duties By Creating and Retaining Retail Pricing "Spreads" That Enriched ESI and Deprived the Plan of Its Assets.

13. ESI retained and exercised discretionary authority and control over the pricing of prescription drugs, including, for example, the determination of "MAC" or "MRA" pricing, the determination of "brand" or "generic" pricing, and/or the determination of the AWP pricing source. ESI, at the same time, also retained and exercised discretion over the terms of contracts with its network of retail pharmacies, which controlled the reimbursement rates for retail drugs. ESI exercised such discretion to create hidden "pricing spreads" that provided ESI with significant revenue, to the detriment of the Plan.

14. The ingredient cost or price of brand name drugs are generally discounted from the Average Wholesale Price ("AWP") that drug manufacturers reported under federal law as their "best price." There are several nationally recognized AWP reporting services. ESI, in its discretion, chose to use First DataBank, which, since the latter part of 2001, has reported prices that were generally and systematically higher than other available pricing sources, thus causing the Plan to pay higher costs (with Plan assets) for brand name drugs.

15. ESI, in its exercise of discretion, can and sometimes did also create "spread"

7

between the discounted brand drug price (*e.g.* AWP-13%) billed to the Plan and the discounted drug price (*e.g.* AWP-14%) paid to the Retail Pharmacy.

16. The ingredient cost or price of each generic drug can be based on a discount from AWP, but most generic drugs are priced based on a proprietary Maximum Allowable Cost ("MAC"), sometimes referred to be ESI as "Maximum Reimbursement Amount" ("MRA").

17. Unlike a fixed discount off of AWP, the MAC or MRA price is set, and re-set, by ESI, (as often as daily), in ESI's sole discretion.

18. At the same time, ESI determines (in its discretion) the MAC price that ESI will pay to a Retail Pharmacy for the same prescription.

19. By using a multiple set of secret, proprietary MAC/MRA lists and/or pricing files, ESI can and does create and retain a "spread" between the (higher) MAC/MRA price ESI sets to determine the price paid by the Plan and the (lower) MAC price ESI sets to determine what it will pay to the retail pharmacy.

20. Such conduct by ESI constitutes a breach of loyalty as well as a prohibited transaction, rendering ESI liable for a disgorgement of profits, restitution of Plan losses, appropriate equitable relief, costs, and reasonable attorneys' fees, pursuant to 29 U.S.C. §§1104(a)(1)(A), 1106(a)(1)(D), 1106(b)(1), 1106(b)(2) and/or 1106(b)(3), and 29 U.S.C. §§1109(a), 1132(a)(2), 1132(a)(3) and 1132(g).

### ESI Violated Its Fiduciary Duties by Contracting with Drug Manufacturers in a Multitude of Ways That Enriched ESI to the Detriment of the Plan.

21. Drug manufacturers employ incentives to maximize their respective sales of pharmaceuticals. In many instances, multiple drug manufacturers make therapeutically equivalent drugs that serve similar therapeutic purposes. Thus, there is, or should be,

8

marketplace competition for the sale of such drugs.

22. Due in large part to its fiduciary relationship with the Plan and other similarly situated Plans, ESI wielded significant market power to ensure marketplace competition and thus reduce the cost of drugs for its clients. The Plan delegated to ESI discretionary control and authority to decide which manufacturers' drugs should be included in (or excluded from) ESI's standardized formulary, and to thereafter decide (1) which drugs to add or delete from that formulary, and (2) which drugs on the formulary will be "preferred." The Plan also delegated to ESI discretionary control and authority to create "formulary compliance" or "adherence" or "drug-switching" programs, which enabled ESI to switch or encourage treating physicians and/or pharmacies and/or the Plan members themselves to switch from one drug to another therapeutically equivalent drugs. In connection with those programs, ESI retained discretionary authority and control over deciding which manufacturers' drugs to include in those programs, as well as the way in which the program would be administered and managed by ESI.

23. At the same time, ESI retained and exercise discretion to negotiate with drug manufacturers to determine the compensation that was paid by drug manufacturers to ESI, as well as the discretionary authority to determine how that compensation would be characterized.

24. To the extent that "rebates" or "formulary savings" or "marketing share incentive payments" were shared with the Plan on a percentage basis, then both the level of compensation and the characterization of such compensation directly affected the level of Plan assets (in the form of shared "rebates" or "formulary savings" or "marketing share incentive payments") flowing back to the Plan. When, for example, ESI decided, in its discretion, to characterize "rebates" as "data" or "administrative" fees, those dollars would not be shared with the Plan.

25. In some cases, upon information and belief, ESI also exercised its discretion to

9

the detriment of the Plan by favoring higher cost drugs in one of its programs and/or formularies.

26. In all cases, ESI retained and exercised the discretion to generate and retain compensation from drug manufacturers by virtue of the drugs purchased with Plan assets and/or the services being provided to (and paid for by) the Plan.

27. Such conduct by ESI constitutes a breach of loyalty as well as a prohibited transaction, rendering ESI liable for a disgorgement of profits, restitution of Plan losses, appropriate equitable relief, costs, and reasonable attorneys' fees, pursuant to 29 U.S.C. §§1104(a)(1)(A), 1106(a)(1)(D), 1106(b)(1), 1106(b)(2) and/or 1106(b)(3), and 29 U.S.C. §§1109(a), 1132(a)(2), 1132(a)(3) and 1132(g).

### ESI Used an Inflated Pricing Source When Setting the AWP and Associated Price for Brand-Name Drugs.

28. As noted above, the price the Plan pays for brand-name drugs at both retail and mail was dependent on the AWP that ESI applied when calculating the rates specified in its contracts with the Plan, AWP less 13% for brand-name drugs dispensed through ESI's retail pharmacy network. The lower the AWP, the lower the price paid by the Plan. The higher the AWP, the higher the price paid by the Plan.

29. ESI retained and exercised discretionary authority to use First DataBank or another "recognized" source (*e.g.*, RedBook, MediSpan) for AWP pricing.

30. As the Plan's fiduciary, ESI was reasonably required to use the source that provided the Plan with the lowest possible costs.

31. ESI chose to use First DataBank pricing when setting the AWP for brand name drugs dispensed to Plan participants and beneficiaries at ESI's retail networks and mail-order facilities. Upon information and belief, ESI also used First DataBank for calculating "data" or

"administrative" fees paid by drug manufacturers to, and retained by, ESI.

32. Upon information and belief, beginning in 2001 or the beginning of 2002, the AWPs for brand-name drugs reported by First DataBank were systematically higher than those reported by other "recognized" AWP sources.

33. On information and belief, ESI knew or should have known that the pricing it was receiving was inflated and thus did not represent the lowest possible AWP price available in the market.

34. The selection and use of First DataBank by ESI constitutes imprudence and want of skill, as well as a breach of loyalty to the Plan, rendering ESI liable for a disgorgement of profits, restitution of Plan losses, appropriate equitable relief, costs, and reasonable attorneys' fees, pursuant to 29 U.S.C. §§1104(a)(1)(A), 1104(a)(1)(B), 1106(a)(1)(D), 1106(b)(1), 1106(b)(2) and/or 1106(b)(3), and 29 U.S.C. §§1109(a), 1132(a)(2), 1132(a)(3) and 1132(g).

## ESI Enriched Itself When Establishing the Prices for Drugs Dispensed at ESI's Mail Order Facilities

35. ESI exercised its discretionary control and authority over drug-manufacturer and wholesaler contracting to enrich itself to the detriment of the Plaintiff. ESI bought drugs from manufacturers and wholesalers to stock the mail-order pharmacies through which ESI sold mail-order prescriptions to Plan beneficiaries and participants. In contracting with those entities, ESI used the leverage it had obtained, in part, through its fiduciary relationship with the Plaintiff, to purchase drugs at significant discounts. ESI, however, did not disclose to the Plan the terms of its drug manufacturer and wholesaler contracts. As a result, ESI was able to conceal from the Plan the fact that ESI has secretly exercised its discretion to create a "spread" between (1) the discounted AWP or MRA that ESI collected from the Plan to pay mail-order prescriptions on

11

behalf of the Plan, and (2) the prices that ESI actually paid the drug manufacturers and wholesalers. ESI retained this "spread" to enrich itself without disclosing such self-dealing to the Plan.

36. On information and belief, the drugs selected by ESI to be available for mail order generally have higher AWPs than other drugs, so that the actual cost to the Plans (and revenue to ESI) was higher on average in mail order transactions for therapeutically equivalent drugs than in retail pharmacy transactions. For example, a retail pharmacy might make available Drug A, with an AWP of $10, discounted by 13% to $8.70 or Drug B, with an AWP of $20, discounted by 13% to $17.40, or Drug C, with an AWP of $30, discounted by 13% to $26.10; ESI's mail order facility might only offer Drug C, with an AWP of $30 discounted by 17.5% to $24.75, (which, although ostensibly offered at a greater discount, was still higher in net cost to the Plan than the net cost of Drugs A or B if purchased at a participating retail pharmacy).

37. Moreover, ESI manipulated the AWP it used to price drugs in the mail order context through re-packaging. On information and belief, ESI purchased drugs in bulk at reduced AWPs and, after re-packaging, dispensed the drugs to Plan participants and beneficiaries in smaller containers with higher AWPs (at increased cost to the Plans).

38. The mail order practices alleged herein, on information and belief, enriched ESI with undisclosed payments, rebates, revenue, or savings, which were the direct and proximate result of self-dealing and/or other breaches of the duty of loyalty and the duty of due diligence and due care ESI owed to the Plaintiff. Such conduct by ESI constitutes a breach of loyalty as well as a prohibited transaction, rendering ESI liable for a disgorgement of profits, restitution of Plan losses, appropriate equitable relief, costs, and reasonable attorneys' fees, pursuant to 29 U.S.C. §§1104(a)(1)(A), 1106(a)(1)(D), 1106(b)(1), 1106(b)(2) and/or 1106(b)(3), and 29 U.S.C.

§§1109(a), 1132(a)(2), 1132(a)(3) and 1132(g).

## ESI Routinely Committed Accounting and Other Administrative Errors That Often Enrich ESI at the Expense of the Plan.

39. On information and belief ESI routinely committed administrative and accounting errors generally inuring to the benefit of ESI, including:

   a. failing to price retail and mail order claims as specified in the Plan-ESI contracts;

   b. allowing pharmacists to collect member co-payments that exceeded the actual cost of their prescriptions;

   c. paying duplicate prescriptions;

   d. making dosing criteria errors;

   e. paying prescriptions outside refill parameters;

   f. making dispense as written ("DAW") errors;

   g. making prior authorization errors;

   h. making system edit errors; and

   i. systematically identifying generic drugs and brand drugs and automatically pricing those claims at the higher brand price.

40. ESI is therefore liable to the Plan for its imprudence and/or want of skill, pursuant to 29 U.S.C. §§1104(a)(1)(B), and 29 U.S.C. §§1109(a), 1132(a)(2), 1132(a)(3) and 1132(g).

41. In addition, and in the alternative, ESI is liable to the Plan for breach of contract.

## Failure by ESI to Fully and Faithfully Disclose Material Facts to the Plan

42. Plaintiff believes and alleges that any alleged "disclosure" or knowledge of the practices alleged herein is legally irrelevant to breach of loyalty and/or prohibited transaction claims. *See* 29 U.S.C. §1110(a); *see also,* 29 U.S.C. §§1002(21)(A), 1104(a)(1)(A) and 1106(b).

13

43. In addition, in the alternative, and out of an abundance of caution, Plaintiff alleges that ESI breached its general duty to disclose under 29 U.S.C. §1104(a), and that all alleged contractual and/or extra-contractual alleged "disclosures" were: (i) materially incomplete; (ii) factually false and misleading; (iii) only general in nature, and did not disclose the specific revenue generated and retained by ESI such that Plaintiff could determine whether such compensation was "reasonable"; and/or, (iv) inconsistent with other representations by ESI to the effect that it negotiates discounts, rebates, and/or other savings on behalf of the Plan and/or its participants and beneficiaries.

## Prayer for Relief

**WHEREFORE** Plaintiff respectfully prays that this Complaint be deemed good and sufficient, and that, after due proceedings are had, there be judgment entered herein, in favor of Plaintiff, on behalf of the Plan, and against ESI:

   a. Declaring that (1) ESI was a fiduciary under ERISA; and (2) ESI has breached its fiduciary duties to the Plan;

   b. Declaring that (1) ESI was a party-in-interest under ERISA; and (2) ESI has knowingly participated in breaches of fiduciary duties to the Plan;

   c. Enjoining ESI from continuing to engage in such violations of ERISA;

   d. Requiring that ESI account to the Plan for (1) all plan assets ESI has retained for its own benefit and use; and (2) all profits earned by ESI through its unlawful activities;

   e. Requiring that all sums due to the Plan from ESI pursuant to such accounting be placed in a constructive trust for distribution to the Plan and/or its participants and beneficiaries;

   f. Requiring ESI to account for and restore all losses suffered by the Plan as a result of ESI's unlawful activities;

g.  Requiring that ESI pay Plaintiff's reasonable attorneys' fees and costs incurred in the prosecution of this action; and,

h.  Awarding any other general, equitable, or remedial relief the Court deems just and appropriate under the circumstances.

DATED this 20th day of October, 2006.

Respectfully submitted,

**UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, by C. JAMES LOWTHERS and STEPHEN A. WOODS, its Trustees**

Stephen F. Meyerkord
MEYERKORD, RINEBERG & GRAHAM, LLC
1717 Park Avenue
St. Louis, MO 63104
Phone: 314-436-9958
Fax: 314-446-9700
sfm@meyerkordlaw.com

Maury A. Herman
Stephen J. Herman
David A. McKay
HERMAN, MATHIS, CASEY, KITCHENS & GEREL, LLP
230 Peachtree South, N.W., Suite 2260
Atlanta, GA 30303
esileadcounsel@hermanmathis.com

Gary W. Kendall, Esq.
Garrett M. Smith, Esq.
MICHIE HAMLETT LOWRY RASMUSSEN & TWEEL PLLC
500 Court Square, Suite 300
P.O. Box 298
Charlottesville, VA 22902
gkendall@mhlrt.com
gsmith@mhlrt.com

Attorneys for Plaintiff

15